IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DIAMOND RANCH ACADEMY, INC., <br><br> Plaintiff and <br> Counterclaim Defendant, <br><br><br> vs. <br><br><br> CHELSEA FILER, <br><br> Defendant and Counterclaim <br> Plaintiff. | ORDER <br><br> AND <br><br> MEMORANDUM DECISION <br><br><br> Case No. 2:14-CV-751-TC |

Plaintiff Diamond Ranch Academy, Inc. (DRA) operates a residential youth treatment facility in Hurricane, Utah.  In 2012, Defendant Chelsea Filer,[1] who attended a residential youth treatment facility (not DRA) as a teenager, began a campaign (mostly on the Internet) to inform members of the public about allegedly deplorable conditions at DRA and to allow a forum for former DRA students to share experiences.

DRA filed this suit, contending that Ms. Filer's statements are defamatory.  DRA asserts defamation claims (libel, libel per se, slander, and slander per se) as well as a claim of intentional interference with prospective economic advantage.

Ms. Filer, as a California resident, has invoked the protection of California's anti-SLAPP statute (SLAPP stands for Strategic Lawsuit Against Public Participation), which provides a

---

[1]The Plaintiff changed her last name to Papciak, but because the official docket lists her as Chelsea Filer, the court will refer to her as Ms. Filer.

defense to one whose exercise of her First Amendment rights is the subject of a lawsuit. Employing the unusual procedural protections of the anti-SLAPP statute, Ms. Filer filed a Special Motion to Strike, asking the court to strike DRA's entire case before discovery begins because DRA has not satisfied the threshold requirements necessary to survive California's anti-SLAPP statute prohibitions.

Applying the standards imposed by the California anti-SLAPP statute,[2] and for the reasons set forth below, the court finds that DRA has established a probability that it will prevail on its libel and libel per se claims for some, but not all, of the statements (some are barred by the one-year statute of limitations). DRA may also proceed on its intentional interference claim based on the statements that are not dismissed here. But the court finds that DRA has not met its burden to salvage its slander and slander per se claims. Accordingly, Ms. Filer's Special Motion to Strike is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[3]

When Chelsea Filer was a teenager, she was sent against her will to a residential youth treatment center in Mexico. (That center, called "Casa by the Sea," was shut down after she

---

[2]Earlier, DRA challenged Ms. Filer's right to rely on the state procedural statute in lieu of the Federal Rules of Civil Procedure for motions to dismiss and for summary judgment. The court held that the state statute does apply and governs the question of whether Ms. Filer is entitled to dismissal at this early stage of the case. (See June 9, 2015 Order & Mem. Decision (ECF No. 55).)

[3]Both DRA and Ms. Filer have filed a substantial number of evidentiary objections. (See Pl.'s Objection to Decls. Filed in Support of Def.'s Special Mot. Strike (ECF No. 73); Def.'s Objections to Decls. Filed in Support of Pl.'s Opp'n to Def.'s Special Mot. Strike (ECF No. 87-1); Pl.'s Objection to Second Decl. and Exs. in support of Def.'s Reply (ECF No. 91).) To the extent the court relies on a piece of evidence to which a party has objected, the objection is overruled.

attended.)  After her allegedly extremely negative, emotionally scarring experience, she became an advocate for youth who are sent to such programs, which she considers to be highly abusive and harmful to the physical and psychological health of the young people who attend.

Ms. Filer did not attend DRA and has never visited the facility.  She first learned about DRA in 2012, after a fellow advocate told her about an episode of "Lifechangers," a talk show hosted by Dr. Drew Pinsky, on which DRA representatives appeared.

Since then, she has been highly critical of DRA.  As part of her campaign against DRA, she started the website "DRASurvivors.com."

On February 22, 2013, in response to Ms. Filer's website, DRA created a website called "TheRealDRASurvivors.com."  On that website, DRA published "The Truth About Diamond Ranch Academy."  DRA also published YouTube videos on November 15, 2013, responding to negative comments about DRA.

Then DRA filed this lawsuit against Ms. Filer, alleging that she published defamatory statements about DRA on the Internet—that is, written statements posted on Ms. Filer's website and on a public Facebook page.  Altogether, DRA claims that Ms. Filer has posted defamatory statements in or from eight sources:

    (1)      A comment allegedly posted by Ms. Filer on the Facebook page called "I Survived Diamond Ranch Academy" on August 1, 2014;

    (2)      The article titled "Diamond Ranch Academy Shows It's [*sic*] True Colors (hereinafter "True Colors"), posted on Ms. Filer's website on January 26, 2014;

    (3)      "Letter to DRA Parent," posted on her website on June 28, 2013;

(4)     "About Diamond Ranch Academy, Overview" (hereinafter "Overview"[4]) originally posted on the website on June 19, 2012, and existing in two amended forms on the website as of August 12, 2014, and January 6, 2015. (See Exs. E-F of Wilde Decl.);

(5)     Complaint to the State of Utah Department of Human Services (DHS) licensing office, which was sent by email and posted on Ms. Filer's website on May 5, 2013;

(6)     Article titled "Dr. Drew Endorses Diamond Ranch Academy," posted on Ms. Filer's website on August 17, 2012;

(7)     Recurring sidebar comment stating "Our message is clear; Diamond Ranch Academy is NOT a legitimate treatment facility and their methods are unethical, illegal and abusive," posted on her website in September 2012; and

(8)     Article titled "Paris Jackson to be sent to Abusive Diamond Ranch Academy," posted on her website on July 9, 2013.

In its Amended Complaint, DRA quotes, and in some cases paraphrases, statements from those sources, and categorizes the statements into eighteen paragraphs. (See Am. Compl. ¶¶ 11(a)–(r) (ECF No. 26).)

In essence, the statements accuse DRA of torturing its students; physically, psychologically, and emotionally abusing the children in its care; running a private prison for teens (in other words, illegally incarcerating children); failing to provide adequate medical care and food to its students; violating basic human and civil rights; acting in a way that caused the wrongful death of at least one student; dehumanizing students through strip searches; using treatment that is unethical, illegal, abusive, and, at times, fatal; dishonestly representing itself as a legitimate treatment facility when, in truth, it is not qualified to be licensed and that uses

---

[4]Ms. Filer refers to this as the "About DRA Webpage." (Papciak Decl. in support of Rule 12(c) Mot. J. on the Pleadings ¶ 2(b)(ii) (ECF No. 30).)

treatment that is neither legitimate nor clinically approved; employing unqualified,

underqualified, unlicensed, and improperly trained medical staff; using deceptive and dishonest

marketing techniques; and scamming parents (customers) out of millions of dollars.  The

following is a sample of language found in the sources:

- "The ones who truly pay the price for naive parents who fall for disingenuous marketing, however, are the children.  Abused and neglected, sometimes they even die locked in these hellholes."[5]

- Concerning the on-site death of former student James Shirey: "All he needed was an extra dose of the medication he was already on and that was already in the possession of the DRA staff, but rather than give it to him, they neglected his requests for medical attention."[6]

- DRA created a "process of dehumanization. . . . In the end, what name Diamond Ranch Academy chooses to call this inhumane and ridiculous treatment is utterly irrelevant.  Seclusion, isolation, menial labor, poor food, denial of privileges —these are conditions children are STILL subjected to on the 'Homeless'/O&A level at Diamond Ranch Academy."[7]

- In a modified version of the Overview, Ms. Filer writes that DRA "is a privately-run teen prison, where due process of the law and even the most basic human rights of children may be violated without cause, legal repercussion or the ability of a student who has become the victim of abuse to voice their grievance.  We at DRA Survivors implore anyone looking into this school for their child to first, do their research.  Ask yourselves if there are signs that point to a program that looks 'too good to be true.'  Is sending your child away worth the risk that they will be abused . . . or that they will never come back at all? RIP James Shirey."[8]

- "Diamond Ranch Academy practices strip searches of minor children

---

[5]"True Colors," attached as Ex. A to Wilde Decl., at 2.

[6]Id. at 3.

[7]Id. at 4.

[8]"Overview" (Jan. 6, 2015 version), attached as Ex. F to Wilde Decl., at 1.

during the admission process.  Diamond Ranch Academy is not registered or licensed as a public prison, jail or detainment facility recognized by the U.S. government.  Yet these children are automatically treated like criminals upon their arrival."[9]

•    "[T]he children are in no way receiving treatment for any diagnosable mental illness or disease, substance abuse, or emotional issues. . . .  What is being offered as treatment, is NOT treatment.  It is ABUSE!"[10]

•    DRA uses "Behavior Modification/Aversion Therapy . . . .  Still considered an experimental therapy and outlawed as cruel and unusual punishment in some states, Aversion Therapy is cautioned to be used with reservation in adequately regulated environments and only by responsible mental health professionals.  DRA does not provide an adequately qualified staff or the required clinical environment to be conducting such experiments.  DRASurvivors recommends that parents consider the risks of psychological damage before placing their child at risk. . . .  The 'therapy' that is enforced through the program is not administered by licensed professions, it is administered by unqualified staff and the kids themselves."[11]

•    "Diamond Ranch Academy appears to be licensed by the state of Utah as a 'Residential Treatment Center' however, upon evaluation of the 'program' in place at DRA as well as the general rules and definition of a 'Residential Treatment Center' by the state of Utah, DRA IS NOT a legitimate treatment center and should not be licensed as such."[12]

DRA also generally alleges on information and belief that Ms. Filer made similar statements orally.

After DRA filed its Amended Complaint, Ms. Filer immediately responded by filing her

---

[9] Id. at 2.

[10] Id. at 3.

[11] Id. at 4.

[12] Id. at 5.

Special Motion to Strike under the California anti-SLAPP statute.[13]  The court, faced with a threshold choice of law issue (that is, whether the California anti-SLAPP statute applies in this federal forum in Utah), determined that the California anti-SLAPP statute governs the question of whether Ms. Filer is now entitled to dismissal of this case.  (See June 9, 2015 Order & Mem. Decision (ECF No. 55).)

The parties have not yet conducted discovery.  But to survive Ms. Filer's Special Motion to Strike under the California anti-SLAPP statute, DRA is required to present evidence as well as allegations to avoid dismissal now.  Under the burden imposed by the anti-SLAPP statute, DRA "must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."  Contemporary Servs. Corp. v. Staff Pro Inc., 152 Cal. App. 4th 1043, 1052 (Cal. Ct. App. 2007) (emphasis added).

## CALIFORNIA'S ANTI-SLAPP STATUTE

Anti-SLAPP statutes, which have been enacted in many states (including California and Utah), provide conditional immunity (or grant a privilege) for statements made about issues of public concern, typically in the context of petitioning the government.  They are "designed to protect the defendant from having to litigate meritless claims aimed at chilling First Amendment expression . . . ."  Batzel v. Smith, 333 F.3d 1018, 1025 (9th Cir. 2003); see also Cal. Civ. Proc. Code § 425.16 (West 2015) ("The Legislature finds and declares that it is in the public interest to

---

[13]She also filed a counterclaim under Utah's anti-SLAPP statute and an alternative motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  Because this order addresses the same issues raised in Ms. Filer's motion for judgment on the pleadings, the court denies that motion (ECF No. 29) as moot.

encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.").  Under the California statute,

> [a] cause of action against a person arising from any act of that person <u>in furtherance of the person's right of petition or free speech</u> under the United States Constitution or the California Constitution <u>in connection with a public issue</u> shall be subject to a special motion to strike, <u>unless</u> the court determines that the plaintiff has established that there is a <u>probability that the plaintiff will prevail</u> on the claim.

<u>Id.</u> § 425.16(b)(1) (emphasis added).

Ms. Filer has filed a Special Motion to Strike DRA's Amended Complaint, a procedural requirement placed on the party seeking protection of the California anti-SLAPP statute, Cal. Civ. Proc. Code §§ 425.15–425.18 (West 2015).[14]  In that motion, Ms. Filer must satisfy her threshold burden to show that the cause of action arises from acts through which she furthered her right to petition or free speech in connection with a "public issue."  <u>Ulkarim v. Westfield LLC</u>, 227 Cal. App. 4th 1266, 1273 (Cal. Ct. App. 2014).  If Ms. Filer satisfies her burden, then DRA must establish, without the benefit of discovery, a probability that it will prevail on its claims.  Cal. Civ. Proc. Code § 425.16(b)(2).  If DRA does not satisfy its burden, the court must dismiss DRA's claims against Ms. Filer.  <u>Id.</u> § 425.16(b)(1).  If DRA satisfies its burden, the parties start fresh and the case proceeds to the usual pre-trial activities, including discovery and motion practice.  <u>Id.</u> § 425.16(b)(3) (providing that if the court finds the plaintiff has met its burden, "neither that determination nor the fact of that determination shall be admissible at any later stage of the case," and no burden of proof applicable at any subsequent stage in the case will

---

[14]Her counterclaim under Utah law is an alternative to her California-law-based motion to strike.  <u>See</u> Utah Citizen Participation in Government Act, Utah Code Ann. § 78B-6-1401 to § 78B-6-1405.

be affected).

For purposes of the court's current analysis under the California anti-SLAPP statute, the court is allowed to review facts in evidence as well as allegations in DRA's Amended Complaint. New.Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1099 (C.D. Cal. 2004) (internal cites and quotation marks omitted).

To avoid dismissal, DRA must show that it will in all probability prevail on the merits of each claim. Cal. Civ. Proc. Code § 425.16(b)(3) (West 2015). To meet its burden, DRA must demonstrate that its claims are "supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." Contemporary Servs. Corp., 152 Cal. App. 4th at 1052 (emphasis added). "As our emerging anti-SLAPP jurisprudence makes plain, the [anti-SLAPP] statute poses no obstacle to suits that possess minimal merit." Navellier v. Sletten, 52 P.3d 703, 712 (Cal. 2002).

At this stage of the proceeding, which simply tests the viability of DRA's claims, DRA need only show admissible "evidence of sufficient substantiality." New.Net, Inc., 356 F. Supp. 2d at 1099 (internal cites and quotation marks omitted). "In making this determination, the court is to consider the pleadings, and supporting and opposing affidavits stating the facts upon which liability is premised," nothing more. Id. (emphasis added).

> [A] plaintiff opposing an anti-SLAPP motion cannot rely on allegations in the complaint, but must set forth evidence that would be admissible at trial. Precisely because the statute (1) permits early intervention in lawsuits alleging unmeritorious causes of action that implicate free speech concerns, and (2) limits opportunity to conduct discovery, the plaintiff's burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law. Only a cause of action that

lacks even minimal merit constitutes a SLAPP.

Overstock.com, Inc. v. Gradient Analytics, Inc., 151 Cal. App. 4th 688, 700 (Cal. Ct. App. 4th 2007) (emphasis added) (internal quotation marks and citations omitted); see also, e.g., Burrill v. Nair, 217 Cal. App. 4th 357, 379 (Cal. Ct. App. 2013) ("[T]he anti-SLAPP statute does not require the plaintiff to prove the specific claim to the trial court; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim.") (emphasis in original); Gallagher v. Connell, 123 Cal. App. 4th 1260, 1269 (Cal. Ct. App. 2004) (balancing interests between defendant and plaintiff by protecting the speaker without "jeopardizing meritorious lawsuits") (internal citation omitted).

## SPECIAL MOTION TO STRIKE

### Ms. Filer has established that her statements concern a public issue.

As an initial matter, Ms. Filer has the burden to establish the first element of her anti-SLAPP defense: that the challenged statements concern a public issue.  If she does not satisfy her burden, the court must deny her motion and follow the usual procedures applicable to a defamation action in federal court.  See Navellier, 52 P.3d at 708 (a defendant moving to strike a cause of action under the California anti-SLAPP statute has the "initial burden of demonstrating the targeted action is one arising from protected activity").

To establish this threshold element, Ms. Filer must show that DRA's Amended Complaint targets an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue."  Cal. Civ. Proc. Code § 425.16(e).  The statute defines a protected act as:

(1) any written or oral statement or writing made before a legislative, executive, or

judicial proceeding, or any other official proceeding authorized by law, (2) any
written or oral statement or writing made in connection with an issue under
consideration or review by a legislative, executive, or judicial body, or any other
official proceeding authorized by law, (3) any written or oral statement or writing
made in <u>a place open to the public or a public forum in connection with an issue
of public interest</u>, or (4) any other conduct in furtherance of the exercise of the
constitutional right of petition or the constitutional right of free speech in
connection with <u>a public issue or an issue of public interest</u>.

<u>Id.</u> (emphasis added).  Subsections (3) and (4) apply here; the analysis is essentially the same for

both.  Specifically, the court must consider whether the statements were made in a public forum

and whether they concerned a "public issue" or "issue of public interest."

DRA's Amended Complaint focuses primarily on statements made on Ms. Filer's website

and Ms. Filer's alleged comments on public Facebook pages.  Under California law, a publicly

accessible website is a "public forum" for purposes of the anti-SLAPP statute.  <u>Barrett v.</u>

<u>Rosenthal</u>, 146 P.3d 510, 514 n.4 (Cal. 2006); <u>Hupp v. Freedom Commn's, Inc.</u>, 163 Cal. Rptr.

3d 919, 923 (Cal. Ct. App. 2013) (quoting <u>Barrett v. Rosenthal</u>); <u>Wilbanks v. Wolk</u>, 17 Cal. Rptr.

3d 497, 505 (Cal. Ct. App. 2004).  Ms. Filer's website and public Facebook pages on which she

allegedly posted comments all fall within the definition of a public forum.

Ms. Filer has also established that the licensing and use of private for-profit teen

rehabilitation programs like DRA is an issue of public interest.  Overall, a public debate about

this issue is clearly occurring on the Internet as well as in regulatory and legislative contexts.

Ms. Filer points to dozens of examples of statements and articles expressing concern (founded or

unfounded is not for the court to determine at this stage) about such programs and DRA

specifically.  Also, in 2005, the State of Utah enacted a law regulating such programs and

requiring each program to be licensed by the state.  And the issue has received attention at the

federal level.  See, e.g., U.S. Gov't Accountability Office, Residential Treatment Programs:

Concerns Regarding Abuse and Death in Certain Programs for Troubled Youth (Oct. 10, 2007);

see also World Wide Ass'n of Specialty Programs v. Pure, Inc. (WWASP), 450 F.3d 1132, 1137

(10th Cir. 2006) ("[I]t is clear that there exists a public controversy as to the most effective

method of treating at-risk teenagers.").

       Based on the above, the court finds that Ms. Filer has satisfied her burden under the

California anti-SLAPP statute and the burden shifts to DRA to establish a probability that it will

prevail on its claims.

**DRA has established a probability of prevailing on all but its slander claims.**

       In her motion, Ms. Filer asks the court to dismiss DRA's claims of slander, slander per se,

libel, libel per se, and intentional interference with prospective economic relations.  First, she

asserts that the slander and slander per se claims are not supported by any factual allegations and

should be dismissed.  Second, she contends that the libel claims are time-barred and that even if

they are not time-barred, DRA is a limited purpose public figure who cannot satisfy its burden of

proving actual malice by clear and convincing evidence.  Third, Ms. Filer argues that because

DRA cannot establish its defamation claims, DRA cannot establish the "improper means"

element of the intentional interference tort which is dependent on the validity of the defamation

claims.  Finally, to the extent DRA's claims are based on the posting of statements by third

parties, Ms. Filer asserts that she is immune from suit under Section 230 of the Communications

Decency Act, which exempts providers and users of an "interactive computer service" from

liability for information "provided by another information content provider."  47 U.S.C.

§ 230(c)(1) (2012).

1.      **Slander and Slander Per Se**

The court begins with DRA's allegation that it was slandered when Ms. Filer made oral

statements against DRA.  DRA generally alleges "upon information and belief" in Paragraph 12

of its Amended Complaint that Ms. Filer "has also made <u>other</u> defamatory statements, both in

writing and <u>orally</u>." (Am. Compl. ¶ 12 (emphasis added).)  Then, in its opposition brief, DRA

bolsters what little is in Paragraph 12 by pointing to sections in Ms. Filer's Declaration (ECF No.

33) that indicate

> that she discussed alleged conditions at DRA, orally, with at least the following
> people: a person at CAFETY (Papciak Decl. ¶ 26), Chris Makaron (<u>Id.</u>, ¶ 27), over
> two dozen former DRA students (although it is presently unknown, but subject to
> discovery, how many of these contacts were oral) (<u>Id.</u>, ¶ 30), and a police sergeant
> with the Hurricane City Police Department (<u>Id.</u>, ¶ 38).

(Pl.'s Opp'n Mem. (ECF No. 71) at 30.)

The allegation in the Amended Complaint has no substance.  That is the only place in the

complaint where DRA alleges anything relating to slander.  And the statements in Ms. Filer's

Declaration quoted above establish at most that Ms. Filer had conversations with those

individuals about DRA.  Neither the content nor dates of conversations are identified in any

meaningful way.  DRA has not shown facts that would support its slander claims, and it is not

entitled to discovery to establish such claims.  Even under the light burden imposed on DRA, its

slander claims are not sufficient.  Accordingly, the court strikes and dismisses the slander and

slander per se claims under the California anti-SLAPP statute.  <u>See</u> <u>Cho v. Chang</u>, 161 Cal. Rptr.

3d at 850 (allowing portions of claims subject to a special motion to strike to be dismissed while

others remain in the lawsuit).  The court will only analyze the written statements.[15]

### 2.      Libel and Libel Per Se

To demonstrate a probability that it will prevail on the merits of its libel and libel per se

claims, DRA must present evidence of three different elements.  First, DRA must provide

evidence that Ms. Filer published statements about DRA that were false, defamatory, and not

subject to any privilege.  WWASP, 450 F.3d at 1136.  Second, DRA must show that Ms. Filer

published the statements with the requisite degree of fault.  The degree of fault and the burden of

proof both depend on whether DRA is a private or a public figure.  If DRA is a private figure, it

must prove by a preponderance of the evidence that Ms. Filer acted negligently.  Seegmiller v.

KSL, Inc., 626 P.2d 968, 973 (Utah 1981).  If DRA is a public figure, it must show by clear and

convincing evidence that Ms. Filer made her statements with actual malice.  WWASP, 450 F.3d

at 1136.  The term "actual malice" is defined as "'knowledge that [the statement] was false or

made with reckless disregard of whether it was false or not.'"  Id. (quoting New York Times v.

Sullivan, 376 U.S. 254, 280 (1964)).  Finally, DRA must establish that the publication injured

DRA.  Id. at 1136, 1139; Ferguson v. Williams & Hunt, Inc., 221 P.3d 205, 213 (Utah 2009).

Damages are presumed in a case of defamation per se.  Larson v. SYSCO Corp., 767 P.2d 557,

560 (Utah 1989); Allred v. Cook, 590 P.2d 318, 320-21 (Utah 1979).

To establish defamation per se, DRA must establish the first two elements of defamation

and that Ms. Filer made false statements that fall into one of four categories: "(1) charge of

---

[15]Written statements fall under the category of libel.  Farm Bureau Life Ins. Co. v. Am.
Nat'l Ins. Co., 505 F. Supp. 2d 1178, 1191 (D. Utah 2007).  If the statements were spoken, the
claim is for slander.  Id.

criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office; and (4) charge of the unchastity of a woman." U.S.A. United Staffing Alliance, LLC v. Workers' Compensation Fund, 213 P.3d 20, 26 (Utah Ct. App. 2009). Given the nature of the statements at issue, the first and third categories—criminal conduct and conduct incompatible with the exercise of a lawful business—apply here.

a. <u>Publication and the Statute of Limitations</u>

Ms. Filer contends that her statements were published outside the statute of limitations and so are time-barred. In a defamation case the statute of limitations is an affirmative defense, and the defendant has the burden to show that the claim is time-barred. Seattle Times Co. v. Rhinehart, 467 U.S. 20, 24 n.3 (1984); Robert L. Kroenlein Trust ex rel. Alden v. Kirchefer, 764 F.3d 1268, 1274 (10th Cir. 2014); Ladd v. Bowers Trucking, Inc., 264 P.3d 752, 753 n.1 (Utah Ct. App. 2011) (citing Seale v. Gowans, 923 P.2d 1361, 1363 (Utah 1996)); Fed. R. Civ. P. 8(c).

In Utah, the statute of limitations for defamation actions is one year. Utah Code Ann. § 78B-2-302(4). DRA filed its complaint on October 16, 2014, so Ms. Filer must establish that the statements were published before October 16, 2013.[16]

The statute of limitations for defamation begins to run on the date the statement is published and the publication is known or reasonably discoverable. Allen v. Ortez, 802 P.2d

---

[16]The statute of limitations for DRA's intentional interference claim would normally be four years. See Russell/Packard Dev., Inc. v. Carson, 78 P.3d 616, 620 (Utah Ct. App. 2003). But for the reasons set forth below in the court's discussion of DRA's intentional interference claim, the court finds that the defamation one-year statute of limitations applies to that claim as well.

1307, 1313-14 (Utah 1990).  Because Ms. Filer posted the vast majority of her statements on the Internet (widely and repeatedly available to the public to read), each posting is similar to an aggregate publication such as a newspaper or book.  Russell v. Standard Corp., 898 P.2d 263, 264-65 (Utah 1995); Restatement (Second) of Torts § 577A(3).  An aggregate publication is treated as a single publication because "[a]ny other rule would unduly prolong the exposure of the media to libel suits by rewarding the inattentive plaintiff."  Id. at 265.  In Utah, as a matter of law, a statement in an aggregate publication is known or reasonably discoverable when it is initially published and widely disseminated to the public.  Id.  Because Russell dealt with an aggregate publication in a newspaper, the court applied the "single publication rule."

The single publication rule was created in response to problems created by the "multiple publication rule" that had been applied in traditional common law defamation before mass media publication was a way of life.  Firth v. New York, 775 N.E.2d 463, 465 (N.Y. 2002).  Under the multiple publication rule, "each communication of a defamatory statement to a third person constituted a separate publication giving rise to a new cause of action."  Id.  If applied to mass media, that rule would result in a constant re-triggering of the statute of limitations and the limitations period would never expire.  Courts' response was to adopt the single publication rule.

Under the single publication rule, for any statement made through a mass publication (such as a newspaper), a plaintiff has a single cause of action.  "The single publication rule prevents the constant tolling of the statute of limitations[.]" Churchill v. New Jersey, 876 A.2d 311, 316 (N.J. Super. Ct. App. Div. 2005).  "Absent this rule, publishers and the mass media would be subject to a multiplicity of claims leading to potential harassment, excessive liability, and draining of judicial resources."  Woodhull v. Meinel, 202 P.3d 126, 130 (N.M. 2008)

(internal citations and quotation marks omitted).

The Utah Supreme Court has not yet applied the defamation statute of limitations to alleged defamatory publications on the Internet.  But other jurisdictions faced with the same issue have uniformly extended the single publication rule to Internet publications such as those posted by Ms. Filer.  "Every state court that has considered the question applies the single-publication rule to information online." Pippen v. NBC Universal Media, LLC, 734 F.3d 610, 615 (7th Cir. 2013) (listing cases); see also Nationwide Bi-Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137, 144 (5th Cir. 2007) (applying Texas law and listing cases); Salyer v. S. Poverty Law Ctr., 701 F. Supp. 2d 912, 914 (W.D. Ky. 2009); Mitan v. Davis, 243 F. Supp. 2d 719, 724 (W.D. Ky. 2003); Clark v. Viacom Int'l, Inc., Case No. 3:12-0675, 2013 WL 1245681, at *3 (M.D. Tenn. Mar. 26, 2013); Woodhull v. Meinel, 202 P.3d 126, 130 (N.M. 2008); Churchill, 876 A.2d at 316; Firth, 775 N.E.2d at 465.  This court predicts that the Utah Supreme Court would follow the well-reasoned lead of those cases and apply the single publication rule to the statements at issue in this case.

DRA focuses on eight sources for the statements that were published on the Internet, all but one on Ms. Filer's website: (1) a comment by Ms. Filer on the Facebook page called "I survived Diamond Ranch Academy"; (2) "Letter to DRA Parent," (3) complaint to the State of Utah DHS Licensing Office; (4) "Paris Jackson To Be Sent To Abusive Diamond Ranch Academy," (5) a recurring sidebar comment (beginning with the words "Our message is clear"); (6) "Dr. Drew Endorses Diamond Ranch Academy," (7) "Diamond Ranch Academy Shows It's [sic] True Colors," and (8) "About Diamond Ranch Academy, Overview" (a first amended and a second amended version).  For the reasons set forth below, the court finds that statements in the

first through sixth sources are time-barred.  But the statements in the "True Colors" article and

the amended "Overview" web page fall within the statute of limitations period.

i.      *Statements in the First through Sixth Sources Are Barred.*

First, DRA points to the Facebook page titled "I survived Diamond Ranch Academy," on

which Ms. Filer purportedly made a comment on August 1, 2014, concerning DRA.  (See Decl.

of Daniel P. Wilde (ECF No. 71-1) ¶ 3, Ex. B.)  A screen shot of a Facebook page with Ms.

Filer's alleged comment is attached to the declaration of Daniel P. Wilde, who states: "Attached

hereto as Exhibit 'B' is a true and correct copy of a Facebook page titled 'I survived Diamond

Ranch Academy', which contains statements allegedly published by Defendant (given that her

name and picture are beside the comments in typical Facebook fashion) on August 1, 2014."

(Wilde Decl. ¶ 3.)  (A publication on August 1, 2014, would not be time-barred.)

Ms. Filer denies that she made the comment and disputes the date of the posting.

"Exhibit HHH to Ms. Filer's second Declaration is a screenshot of a Facebook page, and shows

that the relevant Facebook statements were posted on July 31, 2013, not 2014—as Mr. Wilde

attested."  (Filer's Reply Mem. (ECF No. 87) at 3.)  Ms. Filer objects to Exhibit B stating that it

lacks foundation.  She notes that the screen shot does not contain a posting date.  She also says

that "Mr. Wilde fails to explain why he believes that the relevant post[] occurred on August 1,

2014" or why he has any basis for concluding that Ms. Filer actually posted the comment.  (Id.)

Ms. Filer is correct and the court sustains the objection.

The other sources were published before October 16, 2013.  The "Letter to DRA Parent"

was published on June 28, 2013.  (See Ex. B to Decl. of Chelsea Papciak in support of Rule 12(c)

Mot. for J. on the Pleadings (ECF No. 30).)  The complaint to the State of Utah DHS Licensing

18

Office was published on May 5, 2013.  (See Ex. I to Rule 12(c) Papciak Decl.)  "Paris Jackson To Be Sent To Abusive Diamond Ranch Academy" was published on July 9, 2013.  (See Ex. K to Rule 12(c) Papciak Decl.)  And "Dr. Drew Endorses Diamond Ranch Academy" was published on August 17, 2012.  (See Ex. J to Rule 12(c) Papciak Decl.)

Finally, DRA points to the recurring sidebar message, which states "Our message is clear; Diamond Ranch Academy is NOT a legitimate treatment facility and their methods are unethical, illegal and abusive.  Please, DO NOT send your child to Diamond Ranch Academy."  (See Ex. A to Rule 12(c) Papciak Decl.)  Ms. Filer has presented undisputed evidence that the sidebar comment was posted in September 2012.  (See id. ¶¶ 2(a)(i), 12(c); Special Mot. to Strike (ECF No. 32) at 21 (incorporating Rule 12(c) Mot. J. on the Pleadings (ECF No. 29) Parts III(a), III(r)).)  The sidebar language in DRA's exhibit shows that the message has not changed from its 2012 form.  (See Ex. E to Wilde Decl. at 5.)

Nothing in the record contradicts the evidence that the sources listed above were published before October 16, 2013.  Accordingly, statements in those sources are time-barred.

> ii. *Statements in the seventh and eighth sources—the "Overview" and "True Colors"—fall within the statute of limitations and are subject to suit.*
>
> (a) The article "Diamond Ranch Shows It's [*sic*] True Colors was indisputably published within the statute of limitations.

The fifth source—"Diamond Ranch Shows It's [*sic*] True Colors"—was posted on Ms. Filer's website on January 26, 2014, well after October 2013.  (See Ex. A to Wilde Decl.)  Accordingly, it survives Ms. Filer's statute of limitations challenge.

(b)    "About Diamond Ranch Academy, Overview" was
republished within the statute of limitations.

The original version of the "Overview" was published on June 19, 2012, so that version is

time-barred.  But the first and second amended "Overview" pages were re-posted on the website

after October 16, 2013 (the first amended version of "About Diamond Ranch Academy,

Overview" existed on August 2014, the second amended version of "About Diamond Ranch

Academy, Overview" on January 2015).

Ms. Filer contends that the re-posting of the "Overview" after October 16, 2013, does not

renew the statute of limitations period.  DRA, on the other hand, contends that statements in the

"Overview" fall within the statute of limitations because the source was "republished" after

October 16, 2013.

Under the "republication rule," the court must determine whether the statements were

republished after October 16, 2013.  The republication rule is an exception to the single

publication rule.  "Republication, retriggering the period of limitations, occurs upon a separate

aggregate publication from the original, on a different occasion, which is not merely a delayed

circulation of the original edition."  Firth, 775 N.E.2d at 465 (internal quotation marks and

citation omitted).  Upon republication, a statement otherwise barred by the statute of limitations

is renewed.  "The justification for [the republication] exception to the single publication rule is

that the subsequent publication is intended to and actually reaches a new audience.  Thus, for

example, repetition of a defamatory statement in a later edition of a book, magazine or

newspaper may give rise to a new cause of action."  Id. at 466 (emphasis added); see also Davis

v. Mitan, 347 B.R. 607, 611-12 (W.D. Ky. 2006) ("Republishing material—including publishing

20

a second edition or a book or periodical, editing and republishing defamatory material, or placing

it in a new form—resets the statute of limitations . . . .") (emphasis added);  Woodhull, 202 P.3d

at 131 (same).  In the context of the Internet,

> [t]he mere act of editing a website to add unrelated content does not constitute
> republication of unrelated defamatory material that is posted on the same website.
> Firth, 775 N.E.2d at 466.  Similarly, mere technical changes to a website, such as
> changing the way an item of information is accessed, is not republication.
> Churchill, 876 A.2d at 317, 319. . . .  In contrast, where substantive material is
> added to a website, and that material is related to defamatory material that is
> already posted, a republication has occurred.  Cf. Firth, 775 N.E.2d at 466;
> Churchill, 876 A.2d at 319-20.

Mitan, 347 B.R. at 611 (emphases added).

Cases from other jurisdiction shed some light on the boundaries of republication.  In

Mitan, the court held that "Breaking News!" and "Update!" sections added to the website by

defendant were substantive additions and so they constituted a republication of the original

allegedly defamatory material.  Id. at 610.  But courts have found that if the party makes only

technical changes or adds information not related to the allegedly defamatory material, the

website activity does not constitute republication of the statements.  See, e.g., Viacom Int'l.,

2013 WL 1245681 (no republication when allegedly defamatory text was not changed and only

non-substantive modifications were made to the website); Firth, 775 N.E.2d at 367-68 (no

republication after posting information on state's website about a state agency that was unrelated

to the original material); Churchill, 876 A.2d at 315 (because only technical changes were made

to website which "altered the means by which website visitors accessed the [allegedly

defamatory] report," the statement was not a republication); Salyer, 701 F. Supp. 2d at 914 (no

republication when different articles on the website referred to the original article and provided

hyperlinks to it).

The facts of this case fall somewhere in the middle of the spectrum created by the limited

case law concerning republication on the Internet.  "The question of whether Internet

republication has occurred is <u>highly factual</u> in that it turns on the content of the second

publication as it related to the first."  <u>Woodhull</u>, 202 P.3d at 131 (emphasis added).

Here, to establish republication, DRA compares the language of the original with the

language of the edited text:

> [T]he 2014 version of [the Overview], which according to Defendant, was
> originally published in 2012, is significantly different from the amended and
> updated version of the section first posted some time between October 27, 2014
> and January 2015.  The more-recent version of the "*About Diamond Ranch
> Academy*" webpage, which was first published within the statutory timeframe for
> defamation claims, has <u>five pages and 11 headings and subheadings as opposed to
> the three pages and six headings contained in the 2012 version, and approximately
> 700 additional words.</u>

(Wilde Decl. ¶ 8 (emphasis added).)  DRA also provides specific examples of modifications.

> In Defendant's declaration, paragraph 2.h.1., Defendant claims that she edited her
> original comments on October 27, 2014. The original post said, "In reality, it
> [DRA] is nothing more than a private prison, where due process of the law and
> even the most basic human rights are violated without any reason other than their
> parents felt they needed help and 'it looked nice in the brochures'."  The revision
> says, "[i]t is a privately-run teen prison, where due process of the law and even the
> most basic human rights of children may be violated without cause, legal
> repercussion or the ability for a student who has become the victim of abuse to
> voice their grievance."  In this example, the statement made on October 27, 2014
> is a substantial, significant change that makes the statement even more
> defamatory.

> In Defendant's declaration, paragraph 2.q.ii., Defendant claims that she edited her
> original comments on October 27, 2014. The original post said, "What is called
> 'therapy' is not a clinically approved method of rehabilitation, it is an
> experimental psychological treatment that utilizes the response to fear,
> intimidation and the human longing for love and acceptance as weapons against
> their psyche and forced upon them to ensure absolute submission to the program's

doctrine."  The revision says, "What is called 'The program' of Diamond Ranch Academy is not a clinically approved or evidenced [sic] based method of rehabilitation, but an experimental form of behavior modification that utilizes the response to fear to ensure submission to the program's doctrine."  In this example, Defendant changed the significant words "experimental psychological treatment" to "experimental form of behavior modification".  The revision also removed the significant words "intimidation and the human longing for love and acceptance as weapons against their psyche". These are substantial changes made in October 2014, which is within the statutory period, and the changes do not render the new statement less defamatory.

(DRA's Opp'n to Special Mot. to Strike at 26 n.28.)

Ms. Filer does not dispute that the changes were made.  She contends that the changes were not substantive and so were not sufficient to re-trigger the statute of limitations.  To support her position, Ms. Filer provides red-line versions of the Overview posts, essentially arguing that the changes were mere word-smithing.  But a defamatory statement may be republished if it is simply restated or reworded.  "[E]diting and republishing defamatory material, or placing it in a new form ... resets the statute of limitations."  Mitan, 347 B.R. at 611.  Issuing a new edition of a book or newspaper may be republication.  Firth, 775 N.E.2d at 466; cf. id. ("The mere addition of unrelated information to a Web site cannot be equated with the repetition or defamatory matter in a separately published edition of a book or newspaper.") (emphasis added).  One court has noted that republishing the statement

> in a new form resets the statute of limitations.  This exception protects Plaintiff by providing a remedy where the defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with the goal of reaching a new audience.

Salyer, 701 F. Supp. 2d at 914; see also Thermal Design, Inc. v. Guardian Bldg. Products, Inc., Case. No. 08-C-828, 2012 WL 2254195, *12 (E.D. Wis. June 15, 2012) ( "[R]epeated instances of defamation can lead to multiple causes of action, even if the content is generally the same.").

A review of the different versions of the Overview convinces the court that Ms. Filer has placed the information in a new form.  That is sufficient to find a republication.

Moreover, some of the additions or changes are substantive.  For instance, in the January 2015 version of "Overview," the following language is added: "We have also received reports that admitted females, minor children, are forcibly given pelvic exams and threatened with physical restraint if they refuse."  (Ex. F at 2 (compared to "Admissions" paragraph on August 2014 version (Ex. E).)

Ms. Filer modified the original text of the allegedly defamatory remarks.  The changes were not technical changes to the website, nor were they made in an unrelated part of the website. Accordingly, the court finds that the statements in the first and second amended versions of "About Diamond Ranch Academy, Overview" (made in 2014 and 2015) have been sufficiently changed or edited in a manner that results in republication on the website and so they are not time-barred.

### iii.   Conclusion

The court may strike allegations of statements barred by the statute of limitations, and leave the remaining statements for litigation.  When "an anti-SLAPP motion [is] brought as to an entire complaint containing several causes of action [all of which arise from protected activity], a part of a cause of action could be struck because the plaintiff failed to establish a probability of prevailing as to that particular part."  Cho, 161 Cal. Rptr. 3d at 850 (emphasis in original) (citation omitted).  Accordingly, the court will not strike DRA's libel and libel per se claims as to statements in the "True Colors" article, or either version of the "About Diamond Ranch Academy.  The claims on every other statement are dismissed.

24

b.     <u>False Statements</u>

In its Amended Complaint DRA has alleged that specific statements are false.  To

establish the truth of her statements, Ms. Filer presents her declaration as well as the declarations

of four former DRA students.  (<u>See</u> Decl. of Chelsea Papciak (ECF No. 33); Decl. of M.H. (ECF

No. 34); Decl. of Christopher Makaron (ECF No. 35); Decl. of Jzaurdan Sanchez Adames (ECF

No. 36); Decl. of Zoe Lynn Graham (ECF No. 37).)  Ms. Filer's declarants set forth information

about their experiences at DRA, some of which supports Ms. Filer's contention that the

disparaging remarks she made about DRA are true.

For example, Declarant M.H. was a student at DRA from March through October 2013.

M.H. describes the experience:

> When we arrived at DRA, the intake staff took everything away from me,
> including my clothes.  Staff members strip-searched me.
> . . . .
> Staff prohibited us from talking, fidgeting, straying "off task" by doing things like
> looking around, not eating all of our food, and not asking permission before doing
> things like zipping or unzipping a jacket or applying Chap Stick.
> . . . .
> DRA operated based on fear . . . .
> . . . .
> I personally heard staff threaten students with restraint on multiple occasions. . . .
> Although I never saw a person restrained, I saw students dragged away and heard
> their screams . . . .
> . . . .
> DRA also censored our communications with the outside world by threatening us
> with punishment.  Staff told us that our letters were monitored and any complaints
> about DRA or requests to go home would result in a citation for "manipulation."
> If a letter contained questionable content, it was often referred to the student's
> therapist to determine whether it could be sent.  I was careful to avoid writing
> anything about the real conditions we endured at DRA because I was afraid DRA
> would punish me for being "manipulative."
> . . . .
> Before each [student's] visit [with his family], DRA staff warned the students that
> they would get in trouble for "manipulation" if they talked about conditions at

DRA or asked to go home.
. . . .
DRA also censored students' phone calls with their families. . . . The therapist
told me that he would disconnect the calls and give citations for "manipulation" if
I discussed conditions at DRA or asked to go home.

(Decl. of M.H. ¶¶ 8-9, 12, 14, 19-21 (ECF No. 34).)

Christopher Makaron was also a student, from October 2007 to August 2008.  In his

declaration, he described students as "zombified."  (Decl. of Christopher Makaron ¶ 4 (ECF No.

35).)  As for his own experience, he said:

While I was in "Homeless," staff abused me and other students.  Staff forced us to
sit outside all day, every day, as long as the temperature was above freezing.
Many days it was extremely cold and windy, but we were forced to sit absolutely
still for long periods of time.  If we moved without permission, even to scratch or
shift our weight, staff members would give us a check.  I was in constant pain
from having to sit up straight without permitted to lean on a wall or on my hands.
DRA required that we drink . . . generally a half gallon [of water] in the morning
and a half gallon in the afternoon/evening. . . .  This was painful because we also
were only allowed to use the bathroom at certain times of the day.  We were left to
decide whether to endure the pain of holding our urine, or receive checks by
taking an emergency bathroom break or wetting ourselves.
. . . .
[I was] always hungry because they did not give us enough edible food.
. . . .
During my time at DRA, I saw staff members needlessly and violently restrain
students.
. . . .
I often observed that when a student screamed, the staff member would twist the
student's arm even more forcefully, until it was almost dislocated. . . .

At some point during my stay there, DRA started to give me Lexapro to help with
my depression.  I was not evaluated by a medical professional before this
medication was given to me.
. . . .
DRA censored all of my communications with my family, preventing me from
telling them what was really going on . . . . Any type of communication about
something bad at DRA was deemed "manipulation."
. . . .
As soon as I left DRA, I started having nightmares about being physically abused

and could not sleep well.  Approximately one year after I left DRA, I started
seeing a psychologist to help me cope with the trauma I experienced at DRA.

(Id. ¶¶ 6-7, 9, 12, 14, 17-19, 22.)

A third declarant, Jzaurdan Sanchez Adames, who was at DRA for one year, described

some of her experience:

> A DRA staff member named Stephanie oversaw my group.  The first full day I
> was there, I was eating breakfast, while sitting on the basketball court.  A goat
> escaped from its pen, came over to me, and began to eat my food.  The primary
> rule at DRA was that students were not permitted to do anything without first
> asking permission.  I raised my hand and waited for Stephanie—who was looking
> directly at me—to call on me so I could ask to move away from the goat.  She
> continued to stare at me but ignored me.  The goat stopped eating my food and
> urinated on me, covering my head and clothing with its urine.  I pushed the goat
> away and continued to raise my hand.  Stephanie still ignored me, so I asked if I
> could go change my urine-soaked clothes.   She told me that it was "not the end of
> the world" and that I could not do anything.  I almost vomited from the smell and
> could not finish eating my food.
> . . . .
> [I was] forced to push a donkey cart around a track for no apparent reason.
> . . . .
> While we were in "Homeless," DRA staff forced us to drink a gallon of water
> within four hours every day.  Some students in my group regularly urinated in
> their pants because staff allowed us to use the restroom only once every two
> hours.  Doing so caused the student to lose the day's progress.  I saw staff
> members forcibly restrain girls for not being able to hold their urine.
> . . . .
> I spent every moment at DRA under the direction and supervision of staff
> members.  We had no free time.  I have spoken to former prisoners who have told
> me that they had more freedom in prison than I had at DRA.

(Decl. of Jzaurdan Sanchez Adames ¶¶ 8-9, 11, 23 (ECF No. 36).)

Another student, Zoe Lynn Graham, alleged that she was diagnosed with post-traumatic

stress disorder (PTSD) which was caused by her time at DRA.  (Decl. of Zoe Lynn Graham ¶ 8

(ECF No. 37).)  She says:

> The entire time we were in "Homeless," DRA staff forced us to stay outside all

day regardless of the weather, and do menial and pointless work like pushing a cart around a circular track for hours at a time.

. . . .

The first day that I was in "Homeless," a staff member physically restrained me for crying because I missed my family and did not want to be at DRA.  He forcefully wrench my left hand behind my back and up toward my head, permanently injuring my left shoulder.  While he was holding me like this, he walked me around.  A later injury exacerbated my should[er]; I can now barely lift it above my head and cannot life any heavy objects.

. . . .

The staff members were mostly all very large males.  Sometimes some of them would threaten to sit on me if I was not compliant.

. . . .

DRA also censored [my] communications. . . . I never complained or told my parents about what happened at DRA because I was afraid that DRA would punish me by dropping levels or placing me in "Unemployment."

. . . .

On July 18, 2005, I was told that my grandmother had died.  I had had a close relationship with her and when I cried at the news of her loss, I was given a citation.

. . . .

When I arrived at DRA, I was already on several different medications that my treating doctor had prescribed.  About half way through my stay at DRA, they abruptly changed my medications to a drug I had never taken before.  I never met with a doctor before DRA changed my medication.

. . . .

I still have nightmares once or twice a week that I will be sent back to DRA, and I still have to see a therapist for treatment of my PTSD that stems from my time there.

(Id. ¶¶ 12-14, 23, 28-29, 32.)

DRA has submitted many rebuttal declarations. These include sworn statements from DRA Executive Director Ricky Dias, seventeen DRA employees, five parents of children who went to DRA, and ten former students.  (See ECF Nos. 71-1 to 71-36.)  DRA's declarations contain statements and evidence that either directly contradict information in the declarations submitted by Ms. Filer or provide examples of experiences of staff and students that are inconsistent with the situations described by Ms. Filer's declarants.

28

Executive Director Ricky Dias, in his declaration, says that DRA is a licensed mental health and residential youth treatment facility (Decl. of Ricky Dias (ECF No. 71-20) ¶ 11 (citing to exhibits showing DRA licenses). He says that "DRA's clinical and medical personnel are licensed to practice in their respective fields." (Id. ¶ 12 (citing to exhibits showing employee licenses).) And he lists a series of accreditations or endorsements of DRA. (Id. ¶ 13 (National Association of Therapeutic Schools and Programs, Independent Educational Consultants Association, NWAC/Advanced ED (a "non-profit, non-partisan community of education professionals that conducts on-site external reviews of PreK-12 schools"), and the Better Business Bureau).) The court has also judicially noticed documents that show, for example, employee professional licenses and the State of Utah licensing of DRA.[17] Mr. Dias also provides a DVD containing videos of the DRA facility and student interviews that paint a picture contrary to Ms. Filer's negative descriptions.

A number of former students state that the description by Ms. Filer's declarants of DRA are inconsistent with their own experiences. (See declarations of ten former students (ECF Nos. 71-28 to 71-37).) And Mr. Dias provides evidence that directly or indirectly contradicts some representations in the student declarations relied upon by Ms. Filer. (See, e.g., Ricky Dias Decl. ¶¶ 16-18 (presenting "various pieces of information authored by" the declarants Christopher Makaron, M.H., and Zoe Lynn Graham).)

Staff members discuss methods and policies and observations that are inconsistent with

---

[17]In a contemporaneous order, the court has partially granted DRA's request for judicial notice of certain facts. See Feb. 17, 2016 Order & Mem. Decision on Request for Judicial Notice.

the situations described in the declarations submitted by Ms. Filer.  (See, e.g., Decl. of Tyler

Wright (ECF No. 71-6); Decl. of Trever Thompson (ECF No. 71-7); Decl. of Tayleigh Lee (ECF

No. 71-8); Decl. of McKel Abbott Cleveland (ECF No. 71-9); Decl. of Kade Mathews (ECF No.

71-10); Decl. of Jordan Williams (ECF No. 71-11); Decl. of Ephraim Hanks (ECF No. 71-12);

Decl. of Danny Worwood, M.D. (ECF No. 71-13).)[18]  Parents observed that their children

benefitted from the treatment at DRA.  (See Decl. of Pam Doughty (ECF No. 71-22) ¶ 6; Decl. of

Todd Doughty (ECF No. 71-23) ¶ 6; Decl. of Casasandra Yeager (ECF No. 71-25) ¶¶ 5-6; Decl.

of Mark Yeager (ECF No. 71-26) ¶¶ 5-6; Decl. of Terry King (ECF No. 71-27) ¶¶ 12-13, 16.)

The court may not judge credibility during its review of DRA's case against Ms. Filer.

The court must take DRA's declarations, along with the allegations in DRA's Amended

Complaint, as true for purposes of evaluating the merits of DRA's claim.  Overstock.com Inc. v.

Gradient Analytics, Inc., 151 Cal. App. 4th 688, 700 (Cal. Ct. App. 4th 2007).

The two sets of competing declarations tell very different stories.  This evidence (which

the court must credit in DRA's favor) supports DRA's claim that Ms. Filer's statements about,

for example, unlicensed and untrained staff, the illegitimacy of DRA, and child abuse, are false.

DRA's burden is not high at this stage.  Taking the nature of allegations about Ms. Filer's

statements and evidence (both through declarations and facts judicially noticed by the court)

showing the falsity of those statements, the court finds that DRA has submitted evidence

sufficient to establish a probability that it will prevail on the merits of its claim that Ms. Filer's

statements are not true.

---

[18]Other declarations accomplish the same thing.  (E.g., ECF Nos. 71-14 to 71-18.)

c.    Public Figure

Ms. Filer contends that DRA is a limited purpose public figure who is required to show

actual malice by clear and convincing evidence.

> A public figure may not recover damages for a defamatory falsehood without clear
> and convincing proof that the false "statement was made with 'actual
> malice'—that is, with knowledge that it was false or with reckless disregard of
> whether it was false or not."

Harte-Hanks Comm'ns, Inc. v. Connaughton, 491 U.S. 657, 659 (1989) (quoting New York

Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)).

To determine whether DRA is a limited purpose public figure, the court must (1) isolate

the public controversy; and (2) "examine the type and extent of the plaintiff's participation in that

public controversy."  WWASP, 450 F.3d at 1137.  When examining the extent of the plaintiff's

participation, the courts look at whether the party voluntarily injected itself into the controversy

"in order to influence the resolution of the issues involved."  Hutchinson v. Proxmire, 443 U.S.

111, 134 (1979).  "[I]ndividuals who have 'thrust themselves to the forefront of particular public

controversies in order to influence the resolution of the issues involved' become public figures

'for [the] limited range of issues' associated with those controversies."  Wayment v. Clear

Channel Broad., Inc., 116 P.3d 271, 280 (Utah 2005) (quoting Gertz v. Robert Welch, Inc., 418

U.S. 323, 345 (1974)).

The WWASP case is helpful because it addresses issues that are similar to the ones now

before this court.  WWASP is an association of residential treatment programs for at-risk teens.

It does not own or operate any facility; instead, it is the marketing arm for its members.  The

defendants in WWASP were actively and openly critical on the Internet of  WWASP entities.

31

Ms. Filer is facing similar causes of action that were alleged against the defendants in WWASP.

      i.     Public Controversy

The court in WWASP said "it is clear that there exists a public controversy as to the most effective method of treating at-risk teenagers." WWASP, 450 F.3d at 1137. DRA contends that there is no public controversy in this case and that the issue is whether DRA abuses children. (See Pl.'s Opp'n Mem. at 8-11.) But viewing the statements on Ms. Filer's website, the controversy addressed by Ms. Filer is broader than DRA argues and parallels the issue in WWASP. Just as the Tenth Circuit did in WWASP, this court finds that the controversy concerns the most effective methods of treating at-risk teenagers. DRA is the main target (or "example") used by Ms. Filer in her campaign to stop DRA and other programs using behavioral modification methods on at-risk teens.

      ii.     DRA's Involvement in the Controversy

Ms. Filer points to a specific set of events as evidence that DRA has participated extensively in the public controversy: (1) DRA appeared once on Dr. Drew's Lifechangers television show which is broadcast nationally; (2) DRA created a website on February 22, 2013 (TherealDRAsurvivors.com) in response to Ms. Filer's website; (3) DRA posted videos on YouTube showing students responding to negative comments found on the Internet; and (4) DRA "regularly provides" interviews to various media outlets (Ms. Filer submits example of news articles about DRA). She analogizes the situation in WWASP to the situation here. But while the controversy in both of the cases is the same, DRA's involvement does not rise to the level that existed in WWASP.

DRA is not a member of WWASP and is not affiliated with it in any fashion. (Ricky

Dias Decl. ¶ 9.)  It owns and operates its own facility.  As a business, it actively markets its

programs, but its marketing efforts do not rise to the level of WWASP's.  "A private individual is

not automatically transformed into a public figure just by becoming involved in or associated

with a matter that attracts public attention."  Wolston v. Reader's Digest Ass'n, Inc., 443 U.S.

157, 167 (1979).

WWASP, on the other hand, made the marketing and promotion of the programs and

method of treatment its "mission."  WWASP, 450 F.3d at 1137.  "By more than merely

advocating for its individual members, World Wide has injected itself into the debate by

promoting itself and all programs associated with it."  Id.  It participated in interviews for articles

and television broadcasts that ask whether the treatment methods at World Wide facilities are

effective and discuss the alleged abuses at WWASP facilities.  "World Wide's principals have

given dozens of interviews to media including L.A. Times, 48 Hours, New York Times, Deseret

News, Denver Rocky News, and the Miami Herald, in support of its programs."  Id. (internal

citation and quotation marks omitted).

In contrast, Ms. Filer points to a relatively finite set of media coverage and other

examples of public exposure DRA has received.

DRA appeared on the Dr. Drew television show to offer free tuition to a teenager who

was having drug problems.  The show reached out at the last minute to DRA.  (Ricky Dias Decl.

¶ 8.)  On the show, there was no discussion about whether DRA was safe, true to its

representations, or the overall controversy surrounding residential treatment facilities for teens.

An article in the St. George newspaper reported on the opening of a new facility on the

DRA campus.  DRA responded to questions from the author concerning that new facility.  The

article did not mention anything about the public controversy or accusations against DRA.

One article focuses on celebrity Paris Jackson's possible attendance at DRA based on her publicly discussed problems. There is no evidence that DRA sought out the attention. Ms. Jackson's celebrity status appears to have driven the article. DRA responded to questions from the author, and even then it simply said that DRA would be a good fit for Ms. Jackson if she were to attend.

In an Al Jazeera article, the author points out the many allegations against Utah residential youth facilities. DRA is mentioned. The article contains a statement from a state inspector about DRA as well as a response from DRA's attorney to allegations of abuse and other illegal activities.

The Washington Monthly article also discusses the controversy, focusing heavily on a Florida facility. DRA, along with other facilities in the United States, is briefly discussed. The article noted that DRA has filed lawsuits against it critics "forcefully den[ying] any maltreatment of students[.]" (Id. at 4.)

Ms. Filer's evidence includes a press release issued by Superior Concrete Products (ECF No. 87-7) announcing its donation of a concrete fence and barrier products to support an educational program established at DRA "to help homeless pets and small animals" while helping students to "develop trust, respect and other relationship skills." (Id. at 1.)

In addition to the media coverage listed above, Ms. Filer cites to articles that arise out of DRA's general public relations and marketing activity. (Although Ms. Filer presents a significant set of random hearsay comments from the Internet, the court does not consider that information to constitute media coverage, much less coverage that DRA sought out to resolve

34

any sort of public controversy.)[19]  Ms. Filer emphasizes that DRA has created a

website—TheRealDRASurvivors.com—in response to Ms. Filer's website.  On that website,

DRA defends itself and its programs by countering negative information posted on Ms. Filer's

website.  Similarly, YouTube videos posted by DRA respond to the campaign against DRA (a

video provides responses to accusations by presenting information from other DRA students who

have had a positive experience).

      DRA, like thousands of other entities, has a Linked In account, a Facebook page, and a

company website.  If marketing through a website and public relations articles were to make the

entity a public figure, then such a significant status would apply to a large set of businesses and

educational institutions.

      The examples cited by Ms. Filer actually show that DRA is not affirmatively thrusting

itself into the public controversy.  In the media, DRA is marketing or defending itself.  The

majority of evidence Ms. Filer presents about DRA's public status are her comments as well as

the comments of others.  Ms. Filer and other critics of residential youth treatment facilities have

drawn DRA into the controversy.  Ms. Filer may not create limited purpose public figure status

for DRA.  "A private party does not become a public figure merely because they are pulled into a

public debate."  Silva v. Hearst Corp., 26 Media L. Rep. 2421, at *12-13 (C.D. Cal. 1998).

"Those charged with defamation cannot, by their own conduct, create their own defense by

making the claimant a public figure."  Terry v. Davis Cmty. Church, 131 Cal. App. 4th 1534,

_____

    [19]Ms. Filer provides a large set of copies of non-news-media web pages containing
statements about DRA.  (See Exs. to 2d Decl. of Chelsea Papciak (ECF No. 88).)  DRA's
objections to those are well founded, but even if the court were to consider that evidence, it does
not add anything substantive to the record on limited purpose public figure status.

1547 (Cal. Ct. App. 2005).

DRA is trying to protect itself from a firestorm that is not of its own making. DRA is not a limited purpose public figure. And that requires DRA to show that Ms. Filer did not act as a reasonably prudent person would act to ascertain the truth. Seegmiller, 626 P.2d at 974. Proof of actual malice is not required.

At this stage of the case, under the relatively light burden imposed on DRA, the court finds that DRA has provided sufficient evidence to show a probability of prevailing on the issue of negligence. DRA submits numerous declarations directly contradicting Ms. Filer's evidence and statements on the website. Ms. Filer acknowledges that she did not attend DRA or investigate the truth or source of any of the comments posted by third parties and adopted by her. Ms. Filer negatively responded to and dismissed as naive any comments by those who said they or their children had a good experience at DRA. All of this (giving DRA the benefit of the doubt, as the SLAPP statute burden requires the court to do) sufficiently establishes the element of negligent conduct.

       d.    <u>Injury</u>

DRA presents admissible evidence and uncontroverted allegations that DRA's professional reputation has been damaged and that DRA has suffered a loss of $1,000,000 in business. (See, e.g., Ricky Dias Decl. ¶¶ 2-6; Decl. of Andrew Vance ¶¶ 2-4, 6 (ECF No. 71-4); Decl. of Douglas Bodin ¶ 4 (ECF No. 71-3).) DRA presents evidence that at least two educational consultants have been steering clients to other institutions and that potential clients have pulled away from DRA based on the allegedly defamatory statements. (See, e.g., Ricky Dias Decl. ¶ 5; Vance Decl. ¶¶ 4, 6; Bodin Decl. ¶ 4.)

In addition, the nature of Ms. Filer's comments fall within the definition of defamation

per se, which presumes the subject of the statements has been injured.  The two relevant

categories are criminal conduct and conduct incompatible with the exercise of a lawful business.

Ms. Filer has stated that DRA tortures, physically abuses, and illegally incarcerates its students,

and that it defrauds parents.  Ms. Filer alleges that DRA uses deceptive and dishonest marketing

techniques, uses an illegitimate abusive treatment method, uses untrained and unlicensed medical

staff, and that it violates the basic human and civil rights of its students.  All of these fall within

one or two of the per se categories.

### 3.    Intentional Interference with Prospective Economic Relations

DRA contends that this cause of action is not subject to the special motion to strike

because it is not a defamation cause of action.  But because DRA's action arises out of the same

protected activity underlying its defamation claims (and for the same reason the one-year statute

of limitations for defamation applies to this claim (see the discussion below)), it is subject to

scrutiny under the anti-SLAPP statute.

To establish its tortious interference claim, DRA is required to show that Ms. Filer

intentionally interfered with DRA's existing or potential economic relations by improper means

in a manner that caused injury to DRA.  Eldridge v. Johndrow, 345 P.3d 553, 565 (Utah 2015).

In this case, DRA contends that the "improper means" is the alleged defamation, so this claim

rises or falls based on the validity of DRA's defamation claims.  Ordinarily DRA's tort claim

would be subject to a four-year statute of limitations period.  But DRA's tort claim is subject to

the one-year statute of limitations because the allegations that support DRA's defamation claims

also support DRA's tortious interference claim.  "[C]laims based on the same operative facts that

would support a defamation action" are subject to the one-year statute of limitations. Jensen v. Sawyers, 130 P.3d 325, 336 (Utah 2006), quoted in Bates v. Utah Ass'n of Realtors, 297 P.3d 49, 50 (Utah Ct. App. 2013). The court in Jensen noted applying the one-year statute of limitations to a "false light invasion of privacy" tort claim rather than the four-year catch-all statute of limitations was necessary because otherwise "virtually any defamation claim may be recast as an action for false light invasion of privacy, [and] were we to assign 'catch-all' status to false light invasion of privacy we would effectively neuter the one-year defamation limitation." Id. at 334-36. See also Nationwide Bi-Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137, 146-47 (5th Cir. 2007) ("[W]hen allegedly defamatory statements form the sole basis for a plaintiff's tortious interference claim, defamation's one-year statute of limitation applies."); Sports Unlimited, Inc. v. Lankford Enters., Inc., 275 F.3d 996, 1000-02 (10th Cir. 2002) (applying Kansas's one-year statute of limitations to tortious interference action that was "clearly and solely based on defamatory statements") (internal quotation marks and citation omitted); Cornelius v. DeLuca, 709 F. Supp. 2d 1003, 1014-15 (D. Idaho 2010) (applying Idaho defamation statute of limitations to tortious interference claim).

The court has already held that a portion of DRA's defamation claims survives Ms. Filer's special motion to strike. Accordingly, DRA has established the improper means elements of its tortious interference claim, so the court will consider the remaining elements of the tort.

DRA has presented evidence and uncontroverted allegations in its complaint concerning Ms. Filer's intention when making those statements (for example, her reason for creating the website, her solicitation and posting of negative statements on her website, and her admonition to potential DRA clients not to send their children to DRA), the resulting negative effect on

potential economic relations (decisions by parents to send their children elsewhere and professionals holding back references to DRA due to negative information on the Internet, including Ms. Filer's posts), and injury (damage to DRA's professional reputation and a loss of business).

Give the relatively light burden of proof imposed on DRA at this stage of the proceedings, and based on the above evidence and allegations, none of which have been sufficiently rebutted by Ms. Filer,[20] the court finds that DRA has established a probability at this stage that it will prevail on its claim of intentional interference with potential economic relations.

### 4.   Communications Decency Act Exemption

Ms. Filer contends that her actions are protected by the immunity provision in Section 230 of the Communications Decency Act (CDA).  Under the CDA, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1) (emphasis added). She acknowledges that her defense is relevant only to the extent that DRA is alleging that comments by third parties on her website are defamatory.  (See Def.'s Special Mot. Strike at 25 (ECF No. 32) ("Here, to the extent DRA's claims are based on the posting of statements submitted by other individuals, they are barred by Section 230.").)

Ms. Filer contends that her website is an interactive computer service.  The statute defines

---

[20]Under the anti-SLAPP statute, "the plaintiff's burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law. Only a cause of action that lacks even minimal merit constitutes a SLAPP." Overstock.com, 151 Cal. App. 4th at 700 (emphasis added).

"interactive computer service" as "any information service, system, or access software provider that <u>provides or enables computer access by multiple users to a computer server</u>, including specifically a <u>service or system that provides access to the Internet</u> and such systems operated or services offered by libraries or educational institutions." <u>Id.</u> § 230(f)(2) (emphasis added).  She argues that her website was simply a place for others to have a dialogue and post information about their experiences at DRA.

She then concludes that she is an exempt publisher because she either simply posted others' statements or made minor edits to those statements before posting.  (<u>See</u> Special Mot. Strike at 26.)  "DRASurvivors.com also includes an 'About Diamond Ranch Academy' page, which summarizes many of the core complaints about DRA in a format that is more digestible than reading through many separate survivors' testimonies."  (Papciak Decl. ¶ 34.)  She quotes a Ninth Circuit case that says "the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message."  <u>Batzel v. Smith</u>, 333 F.3d 1018, 1031 (9th Cir. 2008).

But Ms. Filer's posts do not lead a person to believe that she is quoting a third party.  Rather, Ms. Filer has adopted the statements of others and used them to create her comments on the website.  Instead, Ms. Filer adds her own comments to the website, posts her own articles, and summarizes the statements of others.

In addition, many of the third-party statements she uses do not retain their original form.  She did more than simply post whatever information the third parties provided.  She elicited statements through two surveys that contained specific questions to gather information about

specific issues.  The first was titled "'DRA Survey' that asked individuals about their experiences

at DRA in general." (Papciak Decl. (ECF No. 33) ¶ 31.)  The other was titled "'O&A Survey,'

which was specifically focused on the initial 'Homeless'/'Observation and Assessment' level at

DRA.  (Id.)  "Each question in the surveys was about a specific issue, such as meals, restraints,

and strip searchers."  (Id.)  This is another reason that Ms. Filer is not entitled to immunity under

the CDA.  See, e.g., Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008)

(website operator not immune under CDA because it created discriminatory questions and choice

of answers); Carafano v. Metrosplash, Inc., 207 F. Supp. 2d 1055 (C.D. Cal. 2002) (CDA

exemption was not available because users of the website did not simply post whatever

information they desired, but a profile of users was created from questions asked by the

defendant and the answers that were provided.); Jones v. Dirty World Entm't Recordings, LLC,

840 F. Supp. 2d 1008 (E.D. Ky. 2012) (holding that web site operators were not entitled to CDA

immunity and that the defendants specifically encouraged the development of what was offensive

about the content of their web site because (1) the name of the site in and of itself encouraged

posting only of material which was potentially defamatory; (2) the operator acted as editor of the

site and refused to remove postings about the plaintiff that were alleged to be defamatory; and (3)

the operator added his own comments to many postings).

　　　　Finally, Ms. Filer said that she obtained "61 statements from former DRA students: 15

from the DRA survey, five from the O&A survey, 11 full testimonies (these can come in e-mails

or attached at the bottom of the surveys), 11 sworn affidavits, and 19 statements other advocates

collected and gave me.  Of these, I have published 30 statements on my website . . . ." (Papciak

Decl. ¶ 32.)  She selectively chose some statements and rejected others.  DRA contends that the

discarded comments presented positive information about DRA, but the reason is not clear from the record.  (But see Decl. of Toni Ritchey ¶ 18 (ECF No. 71-24) (parent of child who attended DRA noted that the "website contained surveys that could be filled out by former students or anybody else who claimed that he or she was a former student.  Given the uniformity of the answers to the questions on those surveys at the time, I believed the 'opinions' were driven by a very specific set of questions designed to elicit and/or exaggerate only negative comments.")  Despite the fact that she created a place on the website for users to fill in "Survivor Testimony" (a "page that asked former students to submit their full testimony under penalty of perjury" (id.)), the sources for statements targeted by DRA are not postings on the "Survivor Testimony" page.

DRA's allegations focus on publications that are, at a minimum, summaries of third-party statements with Ms. Filer's editorial comments and her own opinion.  Ms. Filer is not entitled to the exemption in the CDA for statements in articles she authored.

**Attorney's Fees and DRA's Request for Sanctions**

The California anti-SLAPP statute has a provision awarding attorney's fees to a prevailing party under certain circumstances:

> [I]n any action subject to [a special motion to strike under the statute], a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs.  If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion[.]

Cal. Civ. Proc. Code § 425.16(c)(1) (West 2015) (emphasis added).  Both parties ask for attorney's fees and costs under that provision.  (See Def.'s Special Mot. Strike (ECF No. 32) at 27; Pl.'s Opp'n to Special Mot. Strike (ECF No. 71) at 40-41.)  In addition, DRA asks for attorney's fees and costs in the form of sanctions (DRA does not cite to any specific rule, case, or

statutory section).  (See Pl.'s Opp'n to Special Mot. Strike at 41-42.)

The court denied a substantial a portion of Ms. Filer's Motion to Strike.  Because she is not a prevailing party, she is not entitled to attorney's fees under the statute.

DRA is also not entitled to attorney's fees.  The allowance for fees under the California anti-SLAPP statute applies only if the court finds that the special motion to strike was frivolous or solely intended to cause unnecessary delay.  The court has granted Ms. Filer's motion in part, so the motion was not frivolous or filed solely to cause delay.  As for DRA's generic request for monetary sanctions, the request has no merit and so it is denied.

## ORDER

For the foregoing reasons, Ms. Filer's Special Motion to Strike (ECF No. 32) is GRANTED IN PART and DENIED IN PART.  The court strikes DRA's slander and slander per se claims, but holds that DRA may proceed on its libel, libel per se, and intentional interference claims.  For the same reasons, Ms. Filer's alternative Rule 12(c) Motion for Judgment on the Pleadings (ECF No. 29) is GRANTED IN PART and DENIED IN PART.  Finally, both parties' requests for attorney's fees are DENIED.

DATED this 17th day of February, 2016.

BY THE COURT:

_Tena Campbell_
TENA CAMPBELL
U.S. District Court Judge

43